Mr. Dubinsky, whenever you're ready. Thank you, Judge Garza. May it please the Court, a little housekeeping matter before I start the presentation. I'd like to start with a discussion of the preamble, which is not a matter that was addressed by either party in the brief, but which has come to the floor as a result of the case that was issued last month, American Medical Systems v. Benetech, where a preamble was found to be non-limiting. And it's important in our case because, of course, in our case we have a claim to a compact cutting machine, and we rely on the preamble for issues relating to invention as a whole, as well as analogous art issues. And part of the allegation in our briefs, of course, is that the Court did not properly consider the preamble desktop when it addressed the claim to invention considered as a whole, or problems that are specific to compact architectures themselves, which is what the invention issue is all about, what the issue of invention solves. We believe that the present case is distinguishable from the American Medical Systems case for several reasons. Of course, the preamble here is relied on to give life, meaning and vitality to the claims. And more importantly, and contrary to the American Medical Systems case, it was relied on extensively during the prosecution as a limitation to the claims. I would cite to the record A3047-48. And there were other questions because the preamble was not an issue earlier. There was other parts of the prosecution where the preamble was also relied on that are not part of the JA. But I submit that one reading the entire prosecution history would be left with the definite, clear, and firm conviction that the preamble was relied on during prosecution as a limitation to the claim. But if the preamble is a limitation, it requires a desktop cutting machine. The prior art, the admitted prior art, which is right from the patent spec, that's clearly a desktop cutting machine.  It definitely is a desktop cutting machine. Are you suggesting then that Johnson and Ambrosio and the others are non-analogous art and couldn't have been considered by the office? I'm not sure that the point is. Okay, Your Honor. Yes, that's exactly our suggestion. We have... Did you make this argument in Borel? Yes, we did. That these are non-analogous? Yes, we did, Your Honor. And I just want to... The only reason I bring up the preamble is because it was not an issue that was in play in Borel, but in view of the American Medical Systems case, I wanted to address it up front here. But the non-analogous art issue is probably one of the preeminent and dominating issues below because the three pieces of secondary art that were relied on by the PTO and at the district court. One was this large extrusion cutting machine for using aluminum extrusion cutting, an aluminum cutting machine for chopping off pieces of metal. One is a little handheld surgical saw that is just held by a surgeon, so it doesn't really have any of the tilt attributes of a saw that the type we're talking about. Does everyone agree with you that line wording, for example, was not analogous prior art and shouldn't have been considered? What then? The PTO cited three, Johnson, Ambrosio... Ambrosio. Ambrosio and line wording. Do I need to send it back under those circumstances if I found that Johnson, for example, was analogous art? Or at least if I found, because it is a question of fact, right? Analogous or it is a question of fact? So if the PTO's decision is supported by substantial evidence in the record, then I can't reverse it even if I agree with you de novo because it's not a de novo issue. So if Johnson's analogous art, but say the other two aren't, do I have to send it back or isn't that enough because the PTO cited three things in the alternative as long as any one of them are analogous art? Well, we would concede, Your Honor, that if this Court were to find that the Johnson, that huge extrusion cutting machine, was analogous art, simply because it happened to have a couple of shafts that were separated by more than a radius of a saw blade, that you would not have to send it back. But our position is that the fundamental problem here, and it's throughout the district court opinion, is that the district court considered the differences between the Clement invention and the parallel art. In other words, the spacing of parallel shafts a certain amount. But what is the problem that the inventor was trying to solve in this case? Because the analogous art test is twofold in the same field of endeavor related to the problem the inventor was trying to solve. I understood the problem to be the ability to have a saw that allows a cut at 35 degrees on either side without needing to pick it up and flip it around or move around with it. Is that right? Well, just to be clear, Your Honor, because most of the workpieces that are used with this type of saw only have one flat edge. You can't spin it. Because you have to keep the flat edge down. You have to do what they call worry building in the industry. Did I describe the problem right? I feel like technical inaccuracy. So the problem is that if you have, and oftentimes if you're cutting crown molding or decorative pieces, like you'll see in this courtroom, you have to be able to cut canfers and angles on both ends. And with the AARP, the applicants that invented prior art, you would have to take that saw and pop it in the workpiece outside of the hallway because sometimes these pieces are as long as the room. And there's no way to move it. So you have to take the saw and the workpiece outside and do some manipulations and bring it back in. So it was very important that we were able to do that. But if the problem the inventor was trying to solve was a need to be able to allow the 45-degree cuts on either side without banging the table such that it has to be twirled around or whatever, then why aren't other kinds of saws, even if they're not table saws, big monstrosities, that are designed such that they allow for the 45-degree cut on either side? Why isn't it relevant to the problem the inventor was trying to solve? Or at least why isn't it close enough such that substantial evidence deference means I've got to agree with them even if I'm not inclined to on my own? Well, personally, Your Honor, we would submit that there is virtually no evidence that, and I think what Your Honor is addressing now is the factual finding that the Johnson saw could cut on a 45-degree angle. Exactly. And the only evidence we had on there was Mr. Gale's statement that the specification of the Johnson reference mentions plus-minus 45-degree cuts. But he also admits that it never says it could do that in a bevel cut, and the only place it describes plus-minus 45-degree cutting is in connection with what's called miter cuts, which are cuts that even the AARP could do. And when it gets to actual – and there's a site in the record, which my colleague will give me in just a second, where Mr. Gale admitted that. And so all he did, Your Honor, was look at the drawings and say, well, it looks like it could tip. The Johnson reference – He said it could tip plus or minus 45 degrees. Yeah, that's what he said. But your element of Claim 8, I don't see anything about mitered in there. I just see that it covers tilting 45 degrees in each direction. Exactly. Right, Your Honor? We don't contend that we're the first ones to make a miter saw that can miter 45 degrees plus-minus. Our invention is in the ability to bevel or tilt. Johnson cannot. Johnson can miter plus-minus 45 degrees just like the AARP, although in the context of what his device is, it's unlikely that even he needs that capability. But what it cannot do, and what the record does not have evidence to support, is that it can bevel plus-minus 45 degrees. In fact, the Johnson reference has this very elaborate mechanism on the turntable to permit him to do effectively mechanical ruining burning so that he can cut either end of an aluminum extrusion. If he had the ability to bevel cut, tilt 45 degrees either way, he would have no need for this elaborate mechanism, this mechanical ruining burning arrangement in his turntable. So I believe that the district court was sort of misled by the statement of plus-minus 45 degrees to believe that that was a reference to bevel cutting when it was not. What we particularly found objectionable there was Mr. Yolen's testimony was based on his reviewing of Figure 1. He said, based on what I see in Figure 1, this is what I can do. I just want to understand factually, you don't think Johnson can tilt 45 degrees in each direction? Not when it's cutting, Your Honor. That's correct. And what Mr. Yolen did is he said, well, I'm looking at Figure 1, and based on what I see in terms of the parts and structures, sure, I do think that can bevel 45 degrees. And then when the bevel expert pointed out that based on a 3D cam evaluation of those structures, it could not, the district court said, wait a minute, now you're using the same figure that Mr. Yolen used for saying it could bevel. Now you're implying scales and things that I'm not going to permit, so I'm going to not permit that testimony and say it can't bevel. But Mr. Yolen did the same thing to say it can bevel. And the fact that, Your Honor, is there is no evidence that it can bevel cut. Doesn't Figure 3 of Johnson show different axes of rotation? Yes, Your Honor, it does. And in certain set-up, it does show certain degrees of freedom during set-up, but the saw blade is not cutting in any of those set-up designs of Figure 3. It just shows how the blade can be manipulated. Exactly. Can you manipulate your blade while it's cutting? No, Your Honor. It's in the same way, right? The point that we were trying to make and that Professor Hatch tried to make was that as you try to, if one were to try to cut plus minus 45 degrees with the Johnson saw, one could not. Just because it had in some sort of set-up mode or some non-relational to workpiece mode the ability to make some movements doesn't mean it could also do cuts in that way. It's almost as if you took the AARP, removed the things that it was going to bump into and said, well, look, if you take away the turntable, that can bend over, that can tilt over 45 degrees too. But, in fact, it really can't because there are things that will obstruct its ability to tilt plus minus 45 degrees. And so one of the issues you raised before the PTO was secondary considerations, right? Yes, Your Honor. Do you understand the record correctly? Did the district court exclude your evidence of commercial success despite the fact that you raised secondary consideration evidence before the PTO? Yes, Your Honor. The district court only admitted evidence of, I believe, one felt need. On what basis was it excluded? On the basis that it was only, there was no evidence presented in the PTO on commercial success. So despite the fact that you had rebutted obviousness and despite the fact that you had introduced secondary consideration evidence, the district court still excluded the commercial success evidence at the 1.5 action? Yes, Your Honor. The district court said you may have introduced in the PTO secondary consideration evidence on issue A and B but not on C, so I'm only going to let you put in secondary consideration evidence on A and B. Is that something, certainly the PTO has raised an issue related to admission of evidence before the district court. Is that issue before us today, the issue of whether it was proper for the district court to exclude the secondary consideration evidence? That was not an issue raised in the Tachikoke brief, Your Honor. Okay. I would note that one of the issues that we are confronting in the Patent Office brief is this allegation that, well, it's giving the court an alternative ground to affirm the district court based on exclusion of all the evidence that was presented into the district court, and it does that based on its citation to Datascope, which is totally the opposite to what it's really trying to achieve. It's not seeking an affirmation of the district court on other grounds. What it is seeking is a reversal of the district court's willingness to hear additional evidence, to hear witnesses, to receive exhibits and other documents, and saying that you should affirm the decision. So it is not an attempt to give the court an alternate grounds of affirmation. Rather, it's an attempt to get an actual reversal of the district court decision. But you have not appealed that issue before us. No, Your Honor. That was raised by the PTO in its opposition brief the first time we ever saw it. So do you think we should be able to consider that issue? I think not. Your Honor, the PTO raised it under the guise of Datascope, saying it was just an alternative ground of affirmation, and that's why I point out that it's not. Will we start two minutes of rebuttal time? Thank you. We were asked a lot of questions. Okay. Thank you, Your Honor. No, please, the court. As came out during this discussion, AAPA is very close to claim one. All it has, and there's a side-by-side of the two on page 8 of our red brief, but for AAPA, you have the saw shaft and the motor touching so that when you start to tilt to the right, you're going to hit the base, and that is an expressly known problem in the prior art that AAPA talks about on page 64 of the record in column 1. And transmission belts were well-known in the art. Ambrosio is probably an even clearer reference as analogous. Johnson and Langworthy are also analogous, but Ambrosio has a transmission belt going from the motor shaft to the saw shaft to dispense power from the motor to the saw blade, and if you just make that single change from AAPA, which is shown in figure 7, to figure 1, you solve the problem, and that's claim one, where you have a transmission means, which is a belt that you then no longer hit the table. What about two shafts being in parallel, though? Does it show that, does it? Yes, Ambrosio shows that, Johnson shows that, and Langworthy all show that. But on different types of sub-arrangements? Yes, Your Honor, they're all motorized saws for varying the angles of cut. But they don't cut at 245-degree angles in opposition, do they? Well, Your Honor, Johnson shows, and our expert at 1854 of the record testified, that when Johnson talks about plus or minus 45 degrees in one direction, he's not limiting that you can't, because of the configuration of the motor away from the saw, have that same flexibility in any direction, but more importantly, Johnson, Ambrosio, and Langworthy all disclose a motor separated from the saw shaft by a distance greater than the radius of the saw blade, and that is the solution which will enable AAPA to then cut at 45 degrees. So they clearly show the needed change from AAPA, that you have the motor shaft just away from the saw shaft, and Johnson does say plus or minus 45 degrees. Our expert testified that Ambrosio and Langworthy each can be cut at 45 degrees because of the spacing, and it's just a given that when the motor shaft is away from the saw shaft, you're going to be able to have that flexibility of cut, and that then makes Claim 1. Claim 1 has just that distinction from AAPA, the spacing of the saw shaft to the motor shaft, and that's taught by the secondary references. Judge Rivell agreed with the board that since the case is only about Claim 1, she actually focused really hard on Claim 1 and its elements, and the prior art and the relationships in that testimony, and she said that just submitting a belt isn't going to change. What is the standard of review that we review fact findings made by the district court in the 145 action? Yeah, I think I said substantial evidence myself earlier, didn't I? And that was not right, so clear, okay. Let's understand that. So you have these gigantic table saws. Let's take Langworthy. Langworthy is a surgical saw. Is it a handheld device? Yes, you can hold it with your hand. How is a handheld device that you can hold with your hand analogous to a table saw? I mean, is my better known for analogous? No, you're not. The problem AAPA shows and Hitachi's inventor was facing was not hitting the base, so that's the problem. Langworthy solves that problem. It's reasonably pertinent because it has a motor with a motor shaft. It has a saw blade with a saw shaft. It's a motorized saw. It says that it is for various cutting angles, so it's really close, and what Judge Rivera found based on expert testimony, et cetera, was that it was reasonably pertinent to the problem that Hitachi's inventor was facing, that when you're going to hit the table, that's your problem. How do you solve that problem? And it was well-known for decades, in those years of 1960s patent, that motorized saws out there had spacing for flexibilities of cut, so this is like a new joint principle, but the references show that that applied. Did they show the fact that the two, what were they called, the two shafts in parallel had to be shifted beyond the edge of the blade in order to operate properly? They clearly disclosed that, Your Honor, if I may. Which one, Johnson? All of them. All of them, absolutely. Opposite page 10 of our red brief, Johnson has, that's the Johnson figure at the top, element 41 is the motor with its shaft, and then it is away from the saw blade, past the radius of the saw blade. The same thing, even more so for Ambrosio, at the next page, you have the motor at Ambrosio item 11 with a pulley or a belt that transmits power to the saw blade, and you can see that, again, it was like a new joint principle to space the motor shaft from the saw blade, and that gives you flexibility in cutting, And as Lee Rovey also shows on the next page, that outside the saw radius, you then have a transmission means where you then connect up to the motor. Are you holding it with your hand or not? You are clearly away from the circumference of the saw blade. So they all show the needed principle that Judge Hubert has. And how do you shift that over to a 45 degree angle? You can cut it 45 degrees, if I'm understanding. Figure 1 showing the Ambrosio, the tilting table saw. Well, the mechanism is down below you, Your Honor, with 19, which is towards the right lower corner where you, and our expert testified, Judge Hubert credited his testimony, that when you start moving things, and you have a, you know, this is a table saw. You can see the saw blade going through the table. You can start to wiggle the trapezoid, I think it is, where you're going to start angling the cut. And Ambrosio clearly says that it is for varying the angular position of the saw blade. That's at page 421 of the record, column 1, line 9, and on. That's at 45 degrees. Inclusive of, because the more you have outside the radius, you can cut at even more angles. And probably figure 1, when you move that, and then the claim says, I believe, 45 degrees or greater, greater than or equal to 45 degrees. For Hitachi's figure 1, when you move that motor away from the saw shaft, you could go past, and their claim says equal to or greater, past 45 degrees. So the problem was, again, with OAPA, the motor shaft would just run into the base because they were too close, and earlier patents all showed spacing, and that problem is pretty clear.  If the motor is away from the saw shaft, it no longer hits. And with the references showing that, we just think that it was an obvious solution to the known problem, and there were only finite options here. Beveled gears, which had a host of problems, or weren't encouraged by the art, was an only other finite option to solve the problem, and they were criticized by even Hitachi's witnesses as having problems being expensive and creating vibrations and noise and making the angle of motor awkward. So on that basis, we think Judge Bevel issued a very thorough opinion in this case. She fully addressed claim construction, analogous art, and reasons to combine the only issues Hitachi has appealed to this court on the basis of her sound reasoning, we think that this court can affirm. If the court has no further questions, I'll take my seat. Thank you, Mr. Pickle. Thank you, Your Honor. Just a few quick points. In Mr. Pickle's presentation, he started off his explanation saying that, oh, let's look at the difference between the applicants of very prior art and what's being claimed, and it's just these parallel spaced shafts. And then let's see, that's the invention. Let's go and look for that, and as soon as we find it, we have the obviousness. And that's not the proper way to address the question of obviousness. The difference is, even KSR will tell us, as we've been writing Graham v. John Deere, that's not the way one addresses the case of obviousness. You can always find pieces of an invention in the prior art. KSR and the wonderful case of Jones v. Harney tell us that. Every mechanical invention has parts that preexisted. The description that Mr. Pickle gave of the three secondary references that PTO is relying on don't prove a thing about the result of what he articulated they do show. If you look at the page opposite page 10 of the red brief of the Johnson, you see this very large transmission protruding off to the same side as the feedstock. There's no way that that can tilt to the right side without that huge, bulbous transmission that sticks out deliberately on one side, hitting that large feedstock mechanism. And the ambrosia, as I think everybody understands, just has nothing to do with the invention. The only reason that his motor is where it is is so that it can be away from the operating theater and be sterilized while the knife portion or the blade portion is in conjunction or close to the body that it's being operated on. And there's no indication that ambrosia, although ambrosia is a table saw, it makes very, very rough types of cuts that trapezoid cannot give the trapezoidal configuration, all of which is under the table, gives no indication of any kind of accuracy. Those saws are just making long rip cuts in rough wood. Nobody calibrates those to a degree or two like finished pieces. And the fact that these saws just totally serendipitously had parallel shafts has nothing to do with any teaching of trying to accomplish something in a compact architecture, which is the problem that we were confronted or Mr. Ushirata was confronted with when he was designing his invention. One last point, Your Honor, and I'll sit down. We were told that there was only a finite number of options. Where did that come from? There was a failed experiment by Mr. Ushirata where he had an upstanding motor that saws at right angles to the blade. That didn't work too well. There was an attempt by another inventor, Mr. Ito, to design along both the Hitachi Koki invention and Mr. Ushirata's initial failed experiment, which was published. And so instead of putting the motor either up or parallel to, but spaced from the saw shaft, he put it at a 45-degree angle. And now we're told that there's no other possibility for solving this problem. That's the finite universe. And I submit, Your Honor, there's no evidence that it's a finite universe. There are likely, I'm not the inventor, but there are likely dozens of other possible mechanical contrivances that can accomplish the result that's necessary. And this is not one of those pieces of mechanical devices that's so predictable, that it's so finite that you only have these three options to choose from, the failed experiment, the design around, and ours. Thank you, Mr. Winstead.  Thank you, Your Honor.